IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

DAVID J. MERLE,                                    OPINION AND ORDER

              Plaintiff,

                                               09-cv-257-bbc

      v.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

              Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

This case concerns an application filed by David J. Merle for Disability Insurance Benefits on September 25, 2003, alleging disability beginning September 4, 2002 because of spinal impairment, carpal tunnel syndrome and depression.  After a hearing on April 26, 2006, administrative law judge Jerome J. Berkowitz issued a written decision, finding that plaintiff was not disabled.   On February 22, 2007, the Appeals Council remanded the case to the administrative law judge for further development and evaluation of plaintiff's mental impairments and carpal tunnel syndrome.  Administrative law judge Berkowitz held a second hearing on December 13, 2007, at which plaintiff, a medical expert and a vocational expert testified.  In a written decision dated January 25, 2008, Berkowitz again found plaintiff was

not disabled because he could perform a significant number of light jobs. This decision became the final decision of the Commissioner when the Appeals Council denied review on January 16, 2009.

On appeal of that decision, plaintiff contends that the administrative law judge committed two errors: 1) he did not properly evaluate the evidence in arriving at his determination that plaintiff's symptoms from carpal tunnel syndrome would not prevent him from performing jobs requiring frequent reaching, handling and fingering; and 2) he failed to cite good reasons for discounting the opinion of plaintiff's treating physician, Dr. Virant, who had stated that plaintiff was incapable of working because of his psychological impairments. I am rejecting plaintiff's arguments and affirming the commissioner's decision. Substantial evidence in the record supports the administrative law judge's conclusion that plaintiff could perform simple grasping on a frequent basis and that plaintiff's mental impairments were not as profound as stated by Dr. Virant.

The following facts are drawn from the administrative record (AR):

FACTS

A.  Background

Plaintiff was born on June 2, 1959 and has a high school education. AR 39. Before seeking disability benefits, he worked as a corrections officer for the State of Minnesota for

2

20 years.  AR 61.  He suffered various injuries on the job, one of which ultimately resulted in spinal fusion surgery in September 2002.  After recovering from the surgery, plaintiff was unable to meet the physical demands of his job as a corrections officer.  He was terminated from that job on April 22, 2003.

On June 2, 2005, plaintiff received a workers' compensation settlement from the Minnesota Department of Corrections in the amount of $30,900.  AR 139-51.

B.  Medical Evidence

1.  Carpal tunnel syndrome

On July 14, 2003, plaintiff saw his treating physician, Dr. Jeffrey Virant, for complaints of hand numbness that wakened him at night and bothered him while driving. Plaintiff attributed his symptoms to keyboarding that he was performing at a job retraining class.  Virant scheduled an electromyogram to evaluate plaintiff's arm and hand complaints. AR 511-13.

The July 30, 2003 electromyogram showed evidence of median neuropathies at the wrists as seen in carpal tunnel syndrome, with a moderate degree of involvement on the right and mild degree of involvement on the left.  There was no evidence of radiculopathy involving the right arm or hand.  AR 401.

In late August, plaintiff had reconstructive surgery on his right foot.  AR 509.  He was

3

on crutches until September 18.

On September 15, 2003, plaintiff was seen by Dr. Ryan L. Karlstad at St. Croix Orthopaedics for the numbness in his arms.  AR 419.  Plaintiff reported that he began having intermittent numbness in both of his arms in April or May of that year.  The numbness involved all of his fingers, radiated up to both shoulders and was aggravated by driving, keyboarding and holding a clipboard.  Plaintiff said his pain was mild at rest and became more severe with activity.  On examination, plaintiff had full range of motion of his shoulders, elbows and wrists with some diminished sensation in his fingers.  He had a positive Tinel's sign in the elbows and wrists.  (A positive Tinel's sign test, in which the patient experiences a tingling sensation in the hand when tapped on the inside of the wrist over the median nerve, is one test used to diagnose carpal tunnel syndrome.  The Merck Manuals Online Medical Library, http://www.merck.com/mmpe/sec04/ch042/ch042f.html.) Dr. Karlstad diagnosed bilateral carpal tunnel syndrome, bilateral cubital tunnel syndrome, left rotator cuff tendinitis and possible thoracic outlet syndrome.  He gave plaintiff steroid injections in both wrists for his carpal tunnel symptoms and told him that he might want to consider carpal tunnel release surgery.  In Karlstad's opinion, plaintiff's symptoms were probably being aggravated by his use of crutches and by his reported repetitive work activities, including "turning keys, keyboarding, prolonged writing, and carrying trays."  AR 420.

4

At a follow-up visit with Karlstad on October 23, 2003, plaintiff reported persisting carpal tunnel symptoms.  Karlstad recommended carpal tunnel release surgery.  AR 418.

On May 6, 2004, orthopedic surgeon Gary Wyard performed an independent medical examination of plaintiff in connection with his claim for workers' compensation.  AR 788. With respect to plaintiff's carpal tunnel syndrome, Wyard noted that although plaintiff had a history of carpal tunnel syndrome as found on the EMG testing, Wyard found no objective evidence on examination to support that diagnosis.  Plaintiff had normal motor and sensory testing in the upper extremities, a negative Tinel's sign and negative Phalen's test.  Wyard concluded that plaintiff was capable of working but needed restrictions and limitations as a result of his back condition.  Specifically, he found that plaintiff could not lift over 50 pounds, should have flexibility in sitting and standing and should not do repetitive or prolonged stooping, squatting, bending, twisting, lifting, pushing or pulling.  AR 799.

On May 7, 2004, Dr. David P. Falconer conducted an independent medical examination of plaintiff.  Falconer is a board-certified orthopedic surgeon with advanced hand fellowship training who specializes in the treatment of hand and upper extremity problems. AR 785.  After examining plaintiff and reviewing his medical records, Falconer concluded that plaintiff had a "strong anatomically and clinically consistent history of carpal tunnel syndrome, right greater than left," along with mild symptoms of right lateral epicondylitis and bilateral shoulder impingement.  Falconer indicated that carpal tunnel

5

release surgery would be appropriate because plaintiff was "quite symptomatic" and had not obtained relief from prolonged splinting or a cortisone injection.  In Falconer's opinion, plaintiff was not totally disabled by his upper extremity problems.  He indicated that until plaintiff obtained treatment for his carpal tunnel conditions, he should lift less than 25 pounds on an intermittent basis and less than 15 pounds on a frequent basis.  In addition, Falconer recommended that plaintiff should use supportive wrist splints and "refrain from repetitive gripping, grasping and squeezing."  AR 786.

On November 11, 2006, plaintiff was examined by Dr. A. Neil Johnson.  Plaintiff said he had a history of carpal tunnel syndrome with associated swelling and numbness in the hands.  Plaintiff said he could button and pick up a coin, but had trouble opening tight jar lids and could not use a hammer or screwdriver very well or for very long.  On examination, Johnson noted that plaintiff had full use of his hands.  He had positive Tinel's sign on both sides and below-average pinch and grip strength, with more weakness on the right than on the left.  Johnson wrote that plaintiff's ability to perform "repetitive activities of the hands would be impaired."  AR 614.

On November 17, 2006, state agency physician Mina Khorshidi completed a physical residual functional capacity assessment for plaintiff, listing diagnoses of back impairment, carpal tunnel and foot impairment.  Khorshidi found that plaintiff could lift 20 pounds occasionally and 10 pounds frequently, stand or walk six hours in an eight-hour work day

6

and sit six hours in an eight-hour work day, could kneel only occasionally and was limited in gross and fine manipulation.  AR 618-25.

On May 11, 2007, Dr. Eric Carlsen examined plaintiff.  Carlsen noted that plaintiff had no difficulty handling small objects and was able to dress and undress himself.  However, plaintiff had decreased sensation in the median distribution of his hands and a positive Tinel's sign at the wrist.  AR 659.  Plaintiff's grip strength was 65 pounds on the right and 75 pounds on the left.  Carlsen found no gross deficits in plaintiff's ability to use his upper limbs, although he noted that it might be difficult for plaintiff to perform some very sensitive fine motor tasks that required significant sensory perception.  He concluded that some mild cognitive issues related to plaintiff's depression might be his most limiting factor.  AR 660.

A September 2006 electromyogram of plaintiff's wrists confirmed moderate median neuropathies consistent with carpal tunnel syndrome.  AR 598.  On an October 2007 assessment form, Dr. Virant indicated that plaintiff could perform manipulative activities only up to one third of an eight-hour day because of his carpal tunnel syndrome.  AR 697-700.

2.  <u>Mental impairment</u>

a.  Dr. Virant

On July 14, 2003, plaintiff told Virant that he was experiencing worsening depression associated with his inability to return to his prior job as a corrections officer and frustration with the way his employer was treating him.  Plaintiff reported that he had been using alcohol to self-medicate.  Virant, who had treated plaintiff for depression since 1999, increased plaintiff's Prozac dosage and gave him a one-month leave of absence from work, on the condition that he pursue intensive counseling immediately.  He referred plaintiff to psychologist Jeff Comins for counseling.

On August 18, Dr. Virant reported that plaintiff had had three sessions with the counselor, Jeff Comins, and was having no significant side effects from the increase in Prozac.  Plaintiff's affect was appropriate and his mental status was intact.  Virant noted that plaintiff was doing "fairly well" regarding his depression and alcohol dependence.  AR 509.

Plaintiff saw Dr. Virant on September 24, 2003, reporting that he was recovering well from his foot surgery and was waiting to see whether the steroid injections in his wrists would help his carpal tunnel symptoms.  Virant noted that plaintiff appeared healthy, his affect was appropriate and his mood seemed neutral to happy.  On October 7, however, plaintiff reported being "physically, mentally, and emotionally shot," explaining that he felt overwhelmed by his various physical impairments, loss of his former job and lack of financial

8

security.   AR 506.   Plaintiff said he had stopped drinking but had started smoking marijuana.  Virant observed that plaintiff appeared fatigued, with a flat affect and sad mood. He noted that plaintiff was on the maximum dose of Prozac and that various other antidepressants that he had tried in the past had either been ineffective or produced undesirable side effects.   Virant prescribed Wellbutrin and made plans for a psychiatry consult.  AR 505.  Three days later, after consulting with a psychiatrist, Virant contacted plaintiff and recommended that he start taking Seroquel and discontinue the Wellbutrin. Id.

On October 27, plaintiff told Dr. Virant that he thought his depression was improving on the Seroquel.  Virant noted that plaintiff appeared considerably calmer and more focused than he had on their last visit.  Virant released plaintiff from all work until at least December 1 and told plaintiff that he would support him in his efforts to obtain disability.  AR 499-500.  On November 15, Virant discontinued Prozac and switched plaintiff to Lexapro.  AR 498.  At plaintiff's request, on November 19, 2003, Dr. Virant wrote a letter stating that plaintiff had been under his care for treatment of major medical depression for a number of years, and that the depression had worsened significantly at the time of plaintiff's foot surgery.  AR 504.

Virant saw plaintiff again on December 19, 2003 and noted that his depression was stable.   Plaintiff was still working with the psychologist.   Virant adjusted plaintiff's

medications.  AR 495-96.  Plaintiff ended his counseling sessions with Comins in January 2004.

Dr. Virant continued to follow plaintiff for his depression up until the time of the second administrative hearing and to write letters and complete forms in support of plaintiff's disability claims.  On October 15, 2004, Dr. Virant wrote a letter stating that plaintiff was grappling with multiple medical concerns and chronic pain issues, including severe depression, pain from his back surgery and significant carpal tunnel syndrome.  He indicated that plaintiff could not maintain full-time employment until his carpal tunnel situation was surgically corrected and his pain was under better control.  AR 491.  In December 2004, he completed a form indicating that plaintiff was unable to work because of depression.  Reporting the results of his current mental evaluation of plaintiff, Virant noted that plaintiff's mood was depressed and irritable, he had a flat affect and was suspicious of others.   Otherwise, he described plaintiff as well-groomed, with intact attention, concentration, memory and judgment, logical and coherent thought processes and no hallucinations or suicidal ideations.  AR 685-686.

In January 2006, Dr. Virant decided to wean plaintiff off Effexor and start him on Cymbalta.  AR 568.  In February 2006, Virant noted that plaintiff was tolerating the Cymbalta well without significant side effects.  AR 567.  On March 25, 2006, Virant completed a form assessing plaintiff's mental ability to do work-related activities.  He

10

indicated that plaintiff had fair ability to follow work rules, relate to coworkers, use judgment and function independently, but poor to no ability to deal with the public, interact with supervisors, deal with work stresses and maintain attention and concentration. AR 577.

Plaintiff saw Dr. Virant on May 5, 2006, reporting ongoing problems with depression that was aggravated by the recent denial of his claim for social security benefits. Virant noted that plaintiff was healthy appearing and fully oriented and his mental status was intact. Plaintiff's affect was flat and his mood was sad. At the request of plaintiff's lawyer, Virant wrote a letter stating that plaintiff suffered from chronic prolonged unremitting severe depression and anxiety. He concluded that plaintiff should not be working because of the degree and intensity of his depression and resulting disordered thinking. Virant explained that although he is a family practice physician and not a psychiatrist, his residency included full additional rotations in psychiatry and for the last 24 years he had practiced a combination of routine family practice and family practice psychiatry. AR 586-87.

On October 29, 2007, Dr. Virant completed another assessment of plaintiff's mental ability to do work-related functions. He stated indicated that plaintiff was severely limited but not precluded from following work rules, using judgment, interacting with supervisors and functioning independently but that he was extremely limited in relating to coworkers, dealing with the public and dealing with work stresses. Plaintiff had moderate limitations

11

in maintaining attention or concentration.  AR 693.

b.  Medical consultants

On January 14, 2004, state agency consulting physician Dan Larson reviewed the record in connection with plaintiff's application for social security disability.  Larson found that plaintiff had depression and a personality disorder that imposed moderate impairments on his ability to work, but that he would be able to perform the following tasks:  concentrate on, understand and remember routine, repetitive instructions; carry out routine, repetitive tasks with adequate persistence and pace; respond appropriately to supervisors; tolerate brief and superficial contact with coworkers and the public; and tolerate the normal stress of a routine, repetitive work setting.  AR 476.  On July 2, 2004, state agency psychologist Ray Conroe, Ph.D., affirmed Larson's assessment.  AR 477.

On June 24, 2004, plaintiff underwent a psychiatric consultative examination by Alford Karayusuf.  After examining plaintiff, Karayusuf diagnosed depression with some anxiety and alcohol and cannabis abuse in remission.  He concluded that plaintiff was able to understand, retain and follow simple instructions but was restricted to brief, superficial interaction with coworkers, supervisors and the public.  AR 469-71.

On September 28, 2004, plaintiff was evaluated by psychiatrist Judith F. Kashtan in connection with his workers' compensation claim.  AR 766-75.  From her interview with

12

plaintiff, mental status exam and review of plaintiff's medical history, Kashtan concluded that plaintiff was not disabled from working because of any psychological impairment.  She observed that despite his depression he had worked for 20 years at a very stressful job as a correctional officer.  In addition, he was managing his disability litigation, engaged in relationships, socializing, pursuing Bible study and making plans for the future.  Kashtan found that plaintiff did not appear depressed or anxious during the interview and had little motivation to return to work.  AR 775.

On September 22, 2006, plaintiff had a psychiatric evaluation by Dr. Julia Bell.  Bell diagnosed dysthymia, post traumatic stress disorder and a generalized anxiety disorder.  She estimated that plaintiff's score on the Global Assessment of Functioning scale was 50.  AR 601-604.  (The GAF scale reports a clinician's assessment of the individual's overall level of functioning.  Sims v. Barnhart, 309 F.3d 424, 427 n. 5 (7th Cir. 2002).  A GAF of 41-50 indicates serious symptoms or functional limitations. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 2000) (Text Revision).) She recommended a change in plaintiff's medications.

On October 30, 2006, plaintiff was examined by Marcus P. Desmonde at the request of the state agency.  Desmonde diagnosed posttraumatic stress disorder, chronic and severe; major depressive disorder, recurrent; and dysthymia.  He gave plaintiff a score of 50-60 on the Global Assessment of Functioning scale.  AR 607.  He concluded that plaintiff appeared

capable of understanding simple instructions and would be able to carry out tasks within limitations set by a treating or evaluating physician.  Also, he stated that plaintiff might have difficulty in interacting with coworkers, supervisors and the general public and that he would have problems tolerating the stress and pressure of full-time competitive employment.  AR 608.

On November 20, 2006, state agency psychologist Keith Bauer completed a Psychiatric Review Technique form for plaintiff, diagnosing affective and anxiety disorders. He concluded plaintiff had mild restrictions of the activities of daily living, moderate difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence and pace, and no episodes of decompensation.  AR 630-43.  Assessing plaintiff's mental residual functional capacity, Bauer found that plaintiff was moderately limited in his ability to understand, remember and carry out detailed instructions, work in coordination with or proximity to others without being distracted by them and interact appropriately with the general public.  AR 626-27.

On May 8, 2007, Dr. Desmonde re-evaluated plaintiff at the request of the state agency.  He diagnosed major depressive disorder, chronic and recurrent and post-traumatic stress disorder.  He gave plaintiff a Global Assessment Functioning score of 55-60.  AR 652. Contrary to his findings after his first examination, Desmonde concluded that plaintiff's mental impairments would *not* limit his ability to understand, remember and carry out

14

instructions or his ability to appropriately respond to supervision, coworkers and work pressures.  However, he indicated that plaintiff would miss a lot of work because of his "pain complaints, fatigue and inability to get to work."  AR 653-54.

At plaintiff's first administrative hearing on April 26, 2006, the administrative law judge called James Huber, a psychologist, to testify as a neutral medical expert.  After reviewing the medical evidence, Huber testified that plaintiff's psychological impairment caused him mild restrictions of activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace and no episodes of decompensation.  AR 836-37.  He concluded that plaintiff would be limited to work that was fairly simple and routine, required only brief and superficial contact with the general public, if any, and no high production rate or fast paced decisions, rapid changes in work environment or unreasonable deadlines.  AR 838.

At the second hearing on December 13, 2007, the administrative law judge called another psychologist, Steven Carter, to testify.  Addressing the question whether plaintiff satisfied the "B" criteria of the listings for mental impairments, Carter testified that plaintiff had moderate restrictions of daily activities, social functioning and maintaining concentration, persistence or pace and no episodes of decompensation.  AR 862-63.  Carter testified that plaintiff should have only brief and superficial contact with the public, coworkers and supervisors, low stress work and no high pace work.  He testified that,

15

although plaintiff gets things done, his onset of task is delayed and his pace in completing things is slowed. AR 866. Plaintiff's attorney asked Carter whether he had considered the most recent assessment completed by Dr. Virant on which Virant found that plaintiff had marked and extreme limitations in many different categories of work-related activities. Carter testified that he had seen the report but that in his view, Virant's conclusions about the degree of plaintiff's limitations were not supported by the evidence. AR 865.

C.  <u>Plaintiff's Testimony</u>

At the first hearing, plaintiff testified that he lived alone and was receiving disability retirement from the Minnesota Department of Corrections, together with long-term disability. He testified that he had received a workers' compensation settlement of about $31,000. AR 814.

Plaintiff testified that he performed his own household chores. He read, walked around to stretch and went out to eat once a month. AR 815-17. He testified that writing and whittling for long periods of time bothered his hands. AR 824-25.

Plaintiff testified that he stopped working after he had spinal fusion surgery in 2002, AR 819, that he could no longer work because he had major depression, that he had dizzy spells, upset stomach, diarrhea and incontinence as side effects from the medication he takes for depression, AR 821, and that he had carpal tunnel syndrome. AR 821.

16

Plaintiff testified that he had seen a psychologist, Dr. Comins, for about a year. A R 828.  He stopped the counseling because he could not afford it and it was not doing any good.  AR 829.  Plaintiff testified that he had just broken up with his girlfriend and that he had difficulties dealing with his eight year old daughter.  He testified that he takes his daughter to parks.  AR 832-33.

At the second hearing, plaintiff testified that Dr. Virant, a general practitioner, had been his treating doctor since 1999, that his psychological problems were keeping him from working, AR 856, and that his depression and anxiety had worsened so that some days he could not get out of bed.  AR 857.  Also, he testified that he had a hard time being around people.

Plaintiff testified that he had carpal tunnel syndrome that causes his hands to go numb and that he has trouble brushing his teeth.  AR 859.  He did not want to have carpal tunnel surgery because he had already had so many surgeries.  AR 860.  Further, he testified that the chiropractic treatments were helping to keep his carpal tunnel symptoms "in check."  AR 859-60.

### D.  Vocational Expert Testimony

Edward J. Utities testified as a neutral vocational expert at both hearings.  AR 845.  At the first hearing, the administrative law judge asked Utities to assume an individual of

17

plaintiff's age, education and work experience who could lift 20 pounds occasionally, sit, stand and walk up to eight hours a day with the option to stand and stretch after 30 minutes, occasionally climb stairs, bend, balance, stoop, crouch, and kneel, and who could not climb ladders or work around unprotected heights or dangerous moving machinery. Also, the administrative law judge told Utities to assume that the individual could not perform "repetitive type of pinching, heavy pinching and grasping, and repetition, I mean like an assembly line type of position where you're doing the same thing over and over again all day long." AR 848.  In addition, the individual would be limited to relatively simple, low stress work requiring only minimal contact with supervisors, coworkers and the general public and no high production goals, rapid changes in the work environment or unreasonable deadlines.  AR 847-48.

Utities testified that although such limitations would prevent the individual from performing plaintiff's past work, they would not prevent him from performing all work. Utities supported this testimony by offering examples of light, unskilled jobs listed in the Dictionary of Occupational Titles that could be performed by a person with such limitations, including bander and cellophaner (DOT #920.685-014), polypacker and heat sealer (DOT #920.686-038), hand bander (DOT #920.687.026) and paper inserter (DOT #920.687-138).  Utities stated that to be able to do these jobs, "a person would have to do simple grasping . . . on a, not necessary [sic] on a repetitive, all-day basis, but at least up to a

18

frequent basis, up to two-thirds of a normal workday." AR 849.  On cross-examination, he stated that although some jobs in each of the various occupations required "constant" reaching, handling and fingering, the jobs he had identified were those in which reaching, handling and fingering was described as "frequent."  AR 851.  Utities testified that his information was consistent with the Dictionary of Occupational Titles, except that the information concerning a sit or stand option was drawn from his professional experience. AR 848-50.

At the second hearing, the administrative law judge again called Utities to testify.  He asked him to assume an individual who could lift 20 pounds occasionally, 10 pounds frequently, stand or walk six hours in an eight-hour workday and sit two hours in an eight-hour workday with the ability to occasionally get up and stretch briefly, occasional stair climbing, bending, stooping and crouching with no climbing ladders, work around unprotected heights or dangerous moving machinery and no repetitive heavy pinching and grasping.  The individual should avoid crowds, have no more than brief and superficial contact with supervisors, coworkers and the general public and perform no high paced or high stress jobs. AR 870.  Utities again offered the bander and cellophaner and polypacker and heat sealer jobs that he had identified at the first hearing, along with the job of assembler of hospital supplies (DOT #712.687-010).  He testified that these jobs involved simple grasping and would not require the performance of very sensitive fine motor tasks.

19

AR 871, 873.

E.   The Administrative Law Judge's Decision

In reaching his conclusion that plaintiff was not disabled, the administrative law judge performed the required five-step sequential analysis. See 20 C.F.R. § 404.1520. At step one, the administrative law judge found that plaintiff had not engaged in substantial gainful activity since September 24, 2002, the alleged onset date. AR 27. At step two, he found that plaintiff had severe impairments of degenerative disc disease of the lumbar spine, status post fusion; carpal tunnel syndrome, status post releases[1]; right bunionectomy and hammertoe repair; plantar fasciitis; major depressive disorder, recurrent; anxiety disorder NOS; and a history of chemical dependency, in remission. At step three, the administrative law judge found that plaintiff did not have an impairment or combination of impairments that met or medically equaled any impairment listed in 20 C.F.R. 404, Subpart P, Appendix 1. With respect to plaintiff's mental impairments, he found that they resulted in moderate restrictions in the activities of daily living, moderate difficulties in social functioning, moderate difficulties in maintaining concentration, persistence or pace, no episode of

---

[1]This finding was in error:  plaintiff never had carpal tunnel release surgery.  However, plaintiff makes no objection to this finding, presumably because it had no effect on the outcome of his application.

decompensation and no evidence of the "paragraph C" criteria.  AR 28-30.

Having concluded that plaintiff's impairments were not severe enough to establish that he was presumptively disabled under the regulations, the administrative law judge proceeded to assess plaintiff's work-related limitations in order to determine whether there was work in the economy that he could perform in spite of his impairments.   The administrative law judge found that plaintiff retained the residual functional capacity to perform light work allowing for occasional stretches, limited to occasional climbing of stairs, bending, stooping and crouching and no climbing of ladders, no work at unprotected heights or near dangerous moving machinery and no heavy pinching or grasping.  Plaintiff was also limited to superficial contacts with others and avoiding exposure to crowds, high pace and stress.  AR 30.

In determining plaintiff's residual functional capacity, the administrative law judge explained that he had considered all of the medical opinions in the record.  With respect to plaintiff's mental limitations, the administrative law judge placed significant weight on the opinion of Dr. Carter, the impartial medical expert, reasoning that Carter had reviewed the entire record and listened to plaintiff's testimony, had expertise in evaluating mental impairments and was familiar with the social security regulations.  AR 37.  Although he acknowledged that plaintiff had a long-term treatment relationship with Dr. Virant, the administrative law judge agreed with Carter that Virant's statements regarding plaintiff's

21

"severe depression" were not well documented by Virant's contemporaneous medical notes or the overall record.  He pointed out that although plaintiff had struggled with periods of depressed mood, social avoidance and motivation, he had been able to complete tasks on his own, maintain his household, care for his young daughter, attend appointments regularly, advocate well for himself, maintain relationships with family and friends and go out in public as needed.  He also noted that Virant had never considered plaintiff a risk for self harm or referred him for inpatient treatment.  Finally, he noted that other consultants, including Dr. Karayusuf, Dr. Kashtan, Dr. Bell and Dr. Desmonde, had formed opinions about plaintiff's functioning that were consistent with the residual functional capacity.  With respect to Desmonde, however, the administrative law judge rejected his 2007 opinion, explaining that it was inconsistent with the overall evidence of record.

At step four, the administrative law judge found that plaintiff was not able to perform his past work in light of his restrictions.  AR 38.  At step five, the administrative law judge found from the vocational expert's testimony, that there were 5,000 jobs available in the regional economy that plaintiff could perform including wrap or pack bander (DOT #920.685-014), wrap machine operator (DOT #920.685-030), polypacker and heat sealer (DOT #920.686-038) and assembler of hospital supplies, noting that "[t]he majority of work requires only simple grasping."  The administrative law judge found the expert's testimony consistent with the information contained in the <u>Dictionary of Occupational</u>

<u>Titles</u> and that the sit or stand option was based on professional experience in the field.  He then concluded that plaintiff was not disabled.  AR 40.


OPINION

A.  <u>Standard of Review</u>

The standard by which a federal court reviews a final decision by the commissioner is well settled:  the commissioner's findings of fact are "conclusive" so long as they are supported by "substantial evidence."  42 U.S.C. § 405(g).  Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971).  The decision cannot stand if it lacks evidentiary support or "is so poorly articulated as to prevent meaningful review."  <u>Steele v. Barnhart</u>, 290 F.3d 936, 940 (7th Cir. 2002).  When the administrative law judge denies benefits, he must build a logical and accurate bridge from the evidence to his conclusion.  <u>Zurawski v. Halter</u>, 245 F.3d 881, 887 (7th Cir. 2001).


B.  <u>Manipulative Limitations</u>

Plaintiff argues that the record does not support the administrative law judge's conclusion that he is able to perform jobs requiring frequent use of the hands for reaching, handling and fingering.  First, he asserts that the administrative law judge failed to give an

23

adequate explanation for this determination.  However, he admits that the administrative law judge implicitly credited the opinions of Dr. Falconer and Dr. Johnson.  Indeed, it is impossible to draw any other conclusion from the administrative law judge's decision.  The administrative law judge referred explicitly to both opinions, pointing out that Falconer had found plaintiff capable of a range of light work and that Johnson had found in 2006 that plaintiff had full use of his hands.  He also noted that Carlsen had precluded "very sensitive fine motor tasks."  AR 38.  Although the administrative law judge did not specify how much weight he was giving each opinion, it is plain from his decision that he credited them.

Even so, argues plaintiff, the administrative law judge's residual functional capacity assessment does not reflect the limitations found by these doctors regarding plaintiff's use of his hands.  First, plaintiff argues in conclusory fashion that an inconsistency exists between the administrative law judge's finding and Dr. Falconer's suggestion that plaintiff refrain from jobs requiring "repetitive gripping, grasping and squeezing" and Dr. Johnson's opinion that plaintiff would be impaired in his ability to use his hands repetitively.  Plaintiff objects to the administrative law judge's finding that plaintiff is able to perform jobs requiring him to use his hands frequently, that is, up to two-thirds of the day, for simple grasping tasks, when the doctors both said that plaintiff would have problems using his hands repetitively.  Plaintiff's objection rests on a basic misunderstanding.  At both hearings, the administrative law judge posed a hypothetical to the vocational expert that captured

24

Falconer and Johnson's limitations nearly verbatim, asking the expert to assume a person who could not perform "repetitive heavy pinching and grasping."  The vocational expert responded by identifying a number of jobs that did not require the performance of such tasks.  At the first hearing, the expert explained that although the jobs required a person to use his hands for up to two-thirds of the day, the person would not necessarily have to do so "on a repetitive, all-day basis."  The vocational expert understood that the terms "repetitive" and "frequent" are distinct from one another.  No one challenged this testimony at the hearing and plaintiff has adduced no evidence that either Falconer or Johnson meant something different than "repetitive" when he used the term.

Instead, plaintiff focuses on Dr. Falconer's statement that plaintiff's carpal tunnel syndrome was "significant and symptomatic" and his recommendation that plaintiff have release surgery.  However, this statement does not support plaintiff's contention that Falconer endorsed more severe hand limitations than the administrative law judge found. Falconer accounted for the active nature of plaintiff's symptoms in forming his opinion, stating that the restrictions would apply "until [plaintiff] seeks definitive treatment for his carpal tunnel conditions."  In addition, Falconer was of the opinion that plaintiff was not totally disabled as a result of his upper extremity limitations.  Finally, Falconer found plaintiff able to lift up to 15 pounds on a frequent basis in spite of his carpal tunnel symptoms.  It is implicit from this finding that Falconer thought plaintiff was able to

25

frequently grasp objects weighing less than 15 pounds; one generally must grab onto something in order to lift it.

Plaintiff identifies another alleged inconsistency: Dr. Karlstad's notation in September 2003 that plaintiff's carpal tunnel symptoms were likely being aggravated by repetitive or prolonged activities such as driving, keyboarding, turning keys and carrying trays is inconsistent and the administrative law judge's conclusion that only repetitive "heavy pinching or grasping" would pose a problem for plaintiff.  However, Karlstad did not offer an opinion of plaintiff's work limitations; further, he noted that plaintiff's use of crutches at that time was a factor contributing to the symptoms.  A year later, Dr. Falconer found plaintiff able to lift up to 15 pounds on a frequent basis in spite of his carpal tunnel symptoms.  Two years later, Dr. Johnson found that plaintiff had full use of his hands, although Johnson thought plaintiff's ability to perform repetitive activities would be impaired.  In May 2007, Dr. Carlsen found no gross deficits in plaintiff's ability to use his upper limbs, although he noted that it might be difficult for plaintiff to perform some very sensitive fine motor tasks that required significant sensory perception.  Finally, plaintiff testified that his primary disabling impairment was his depression.  The administrative law judge discussed all this evidence in his decision.  It reasonably supports his conclusion that plaintiff could use his hands frequently for simple grasping.

Plaintiff also makes the unpersuasive argument that the administrative law judge

26

erred by failing to give weight to Dr. Virant's opinion concerning plaintiff's manipulative limitations. As plaintiff points out, the administrative law judge went to great lengths to explain why he was discounting Virant's opinion concerning plaintiff's mental limitations, but he did not address Virant's his opinion concerning plaintiff's use of his hands. Nevertheless, this omission is not an error warranting remand. An administrative law judge is not required to discuss every piece of evidence in his decision. Rice v. Barnhart, 384 F.3d 363, 371 (7th Cir. 2004). It is plain that the administrative law judge found the opinion of Virant, a general physician, to be of little weight regarding plaintiff's hand limitations when compared to that of Falconer, a hand specialist who conducted a thorough evaluation of plaintiff's carpal tunnel symptoms, and the other specialists who examined plaintiff. Virant's notes include few examinations of plaintiff's upper extremities or objective findings to support his restrictive view of plaintiff's manipulative limitations, leaving the impression that his opinion was based solely on plaintiff's subjective complaints. Contrary to plaintiff's argument, the fact that Virant might have ordered an EMG that showed that plaintiff had neuropathies consistent with carpal tunnel syndrome does little to show that Virant had an objective basis for his opinion regarding plaintiff's limitations. In light of Virant's limited involvement in treating plaintiff's carpal tunnel syndrome and his lack of expertise relative to that of Dr. Falconer and some of the other medical sources, his opinion was entitled to little weight. Further, given the depth of the evidence in the record that focused on

plaintiff's carpal tunnel syndrome and manipulative limitations, the administrative law judge did not err in failing to recontact Virant and ask him for a better explanation of his opinion. Simila v. Astrue, 573 F.3d 503, 516 (7th Cir. 2009) (ALJ need only contact physician for further information where medical support for physician's findings is not readily discernible); Skinner v. Astrue, 478 F.3d 836, 843 (7th Cir. 2007) ("ALJs may contact treating physicians for further information when the information already in the record is 'inadequate' to make a determination of disability").  I am satisfied that the outcome would not be different on remand if I was to remand this case for a more detailed analysis of Dr. Virant's opinion concerning plaintiff's hand limitations.  Keys v. Barnhart, 347 F.3d 990, 994 (7th Cir. 2003)(harmless error doctrine applies to administrative decisions).

In sum, the administrative law judge adequately discussed the evidence concerning plaintiff's hand limitations and reached a conclusion based on substantial evidence in the record.  As a whole, the record supports the administrative law judge's conclusion that plaintiff is able to use his hands for simple grasping up to two-thirds of the day.

C.  Mental Limitations

The administrative law judge found that plaintiff retained the mental residual functional capacity to perform work limited to superficial contact with others, no exposure to crowds and no high pace or stress.  Plaintiff contends that the administrative law judge

28

erred in making this residual functional capacity finding because he discounted Dr. Virant's opinion that plaintiff was unable to work full time because of his psychological impairment. In Virant's opinion, plaintiff had extreme limitations in his ability to relate to coworkers, deal with the public and handle work stress that prevented him from working.

Although an administrative law judge must consider all medical opinions of record, he is not bound by those opinions.  Haynes v. Barnhart, 416 F.3d 621, 630 (7th Cir. 2005). "[T]he weight properly to be given to testimony or other evidence of a treating physician depends on circumstances."  Hofslien v. Barnhart, 439 F.3d 375, 377 (7th Cir. 2006). When a treating physician's opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and no evidence exists to contradict it, the administrative law judge has no basis on which to refuse to accept the opinion.  Id.; 20 C.F.R. § 404.1527(d)(2).  When, however, the record contains well supported contradictory evidence, the treating physician's opinion "is just one more piece of evidence for the administrative law judge to weigh," taking into consideration the various factors listed in the regulation.  Id.  These factors include the number of times the treating physician has examined the claimant, whether the physician is a specialist in the allegedly disabling condition, how consistent the physician's opinion is with the evidence as a whole and other factors.  20 C.F.R. § 404.1527(d)(2).  An administrative law judge must provide "good reasons" for the weight he gives a treating source opinion, id., and must base his decision on

29

substantial evidence and not mere speculation.  White v. Apfel, 167 F.3d 369, 375 (7th Cir. 1999).  An opinion of a non-examining physician is not sufficient by itself to provide evidence necessary to reject a treating physician's opinion.  Gudgel v. Barnhart, 345 F. 3d 467, 470 (7th Cir. 2003).

Plaintiff argues that the administrative law judge violated this rule by relying solely on the testimony of the medical expert, Dr. Carter, to discount Virant's opinion.  This argument does not fairly represent what the administrative law judge said in his decision. It is true that he accepted Carter's opinion over Virant's, but he did so only after reviewing all of the other evidence in the record and determining that Carter's opinion was most consistent with it.  In addition to finding a lack of supporting documentation for the extreme limitations Virant endorsed, the administrative law judge noted the reports of other mental health professionals who found that plaintiff was not disabled, including Dr. Kashtan and Dr. Karayusuf.  He further found that Virant's blanket statements of disability were inconsistent with plaintiff's activities, noting that plaintiff lived independently, shared custody of his daughter, completed household tasks and maintained relationships with friends and family.

All of these were good reasons for rejecting Dr. Virant's opinion.  As the administrative law judge pointed out, Virant's observations of plaintiff, in which Virant found plaintiff to be well groomed and fully oriented, with normal judgment, attention,

30

concentration, memory and thought content, failed to provide objective support for his opinion that plaintiff suffered from disabling depression. In addition, Virant's opinion was out of step with the other consultants who examined plaintiff and with plaintiff's activities, which, although limited, suggested that plaintiff was more functional than Virant suggested. This is not a case in which the administrative law judge simply chose to accept a non-examining consultant's opinion without any analysis or explanation of how he arrived at that decision. To the contrary, the administrative law judge's reasoning is clear and adequately supported by the record.

Plaintiff argues that Desmonde's statement in November 2006 that plaintiff "would have problems tolerating the stress and pressure of full time competitive employment at this time" and his later statement in 2007 that plaintiff would miss a lot of work because of his multiple complaints and "inability to get to work" were consistent with each other and with Virant's opinion that plaintiff was disabled. Although plaintiff offers a plausible reading of Desmonde's statements, it is not the only one. As the commissioner points out, Desmonde's opinions were inconsistent on a different matter:  whereas Desmonde stated in 2006 that plaintiff would have difficulty in interacting with coworkers, supervisors and the general public, he endorsed no such limitations in 2007. This latter opinion was inconsistent with that of the other psychiatrists and psychologists, all of whom agreed that plaintiff should have limited contact with others. In light of this, along with the fact that Desmonde's 2007

31

opinion appeared to account for plaintiff's physical complaints, the administrative law judge did not err in disregarding the 2007 opinion.

As for Desmonde's November 2006 statement, it is unclear what Desmonde meant when he said plaintiff "would have problems" tolerating the stress and pressure of full time competitive employment.  He might have meant that plaintiff was unable to work or he might have meant that plaintiff could work, but that it would be a struggle for him to do so. In light of the vagueness of Desmonde's statement, I cannot conclude that the administrative law judge erred by accounting for the statement by limiting plaintiff to jobs that did not involve high degrees of stress or pace.  As the administrative law judge noted, in the 2006 statement, Desmonde gave plaintiff a score of 50-60 on the Global Assessment of Functioning Scale, which indicates only moderate symptoms.  American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 2000) (Text Revision).  Further, other mental health professionals who examined plaintiff or considered his medical history found that he could work under certain conditions.  Taken as a whole, the record supports the manner in which the administrative law judge interpreted Desmonde's opinion.

In sum, although Dr. Virant was plaintiff's treating physician, the administrative law judge gave logical, well-supported reasons for rejecting his opinion that plaintiff was totally disabled.  Moreover, there is substantial evidence in the record that plaintiff could perform

32

work that did not involve more than superficial contacts with others and no high pace or stress. I conclude that the administrative law judge did not err in determining plaintiff's mental residual functional capacity.

ORDER

IT IS ORDERED that the decision of defendant Michael J. Astrue, Commissioner of Social Security, denying plaintiff David J. Merle's application for disability insurance benefits and supplemental security income is AFFIRMED. The clerk of court is directed to enter judgment in favor of defendant and close this case.

Entered this 4th day of February, 2010.

BY THE COURT:

/s/

_____
BARBARA B. CRABB
District Judge

33